UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>RYAN CLIFFORD BRADFORD and JUDY KAY BRADFORD, dba PITCHFORK CATTLE CO.,<br><br>          Debtors.<br><br>RYAN CLIFFORD BRADFORD and JUDY KAY BRADFORD, dba PITCHFORK CATTLE CO.,<br><br>          Plaintiffs,<br><br>v.<br><br>BANK OF EASTERN OREGON, a national banking association,<br><br>          Defendant. | Case No. 1:18-cv-00397-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Plaintiff Ryan and Judy Bradford's Motion to Withdraw the Reference (Dkt. 1) and Motion to Transfer Venue (Dkt. 4). The Court will grant the motion to withdraw the reference to the extent plaintiffs ask the Court to withdraw the reference when the case is ready for trial but will deny the motion to the extent an immediate withdrawal is sought. The bankruptcy court will preside over all pretrial matters in the proceeding, including the pending motion to transfer venue.

**MEMORANDUM DECISION & ORDER - 1**

# BACKGROUND

A. **Procedural Background**

In November 2017, Ryan and Judy Bradford filed a chapter 12 bankruptcy petition in this District. A plan of reorganization has not been confirmed, and the bankruptcy court has *sua sponte* scheduled a dismissal hearing for January 9 and 10, 2019. Several months before that hearing was scheduled, the Bradfords filed an adversary complaint against one of their creditors, the Bank of Eastern Oregon ("BEO" or "the bank"). The Bradfords now ask this Court to withdraw the reference and transfer the adversary proceeding to the District of Oregon.

B. **The Adversary Complaint**

In their adversary complaint, the Bradfords allege various state-law claims against BEO, including breach of contract, fraud, breach of fiduciary duty, negligence, unjust enrichment, intentional interference with economic relations, accounting, and defamation.[1] The claims are based on the following alleged facts:

The Bradfords operate a cattle ranch in Malheur County, Oregon. For several years, they financed their operation with loans from BEO. Every year between June 2010 and March 2016, the bank approved a revolving line of credit. The Bradfords would use monies they received from cattle sales to pay down their loans. The Bradfords remained

---

[1] The Bradford also allege a claim for "waiver." *See Adversary Compl.*, ¶¶ 139-143. Waiver is simply the intentional relinquishment of a known right. *See, e.g., Guardian Management, LLC ex rel. Villa v. Zamiello*, 95 P.3d 1139, 1141 (Ct. App. 2004). Thus, although not entirely clear, the Court presumes that with this claim, the Bradfords are pursuing damages under a promissory estoppel theory. *See generally Rick Franklin Corp. v. State ex rel. Dept. of Transp.*, 140 P.3d 1136, 1140 (Ct. App. Or. 2006) ("Promissory estoppel requires: (1) a promise, (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred, (3) actual reliance on the promise, (4) resulting in a substantial change in position.") (citation and footnote omitted)).

current on their loan obligations, and as of November 2015 the bank had been paid in full for all previous loans.

In March 2016, BEO issued the seventh – and what turned out to be the final – operating loan for $788,000. At that time, the Bradfords also needed another $240,000 to repay a loan from the Producers Livestock Marketing Association (the "Producers"). The Bradfords had purchased cattle from the Producers on credit and the $240,000 owed to Producers represented an operating loss. *See Adversary Compl.*, Bankr. Dkt. 1, ¶ 36. The bank issued a $201,000 loan to cover this loss, with instructions to the Bradfords to use their operating loan to make up the shortfall.

Roughly six months later, in September 2016, the Bradfords needed another $220,000 to purchase cattle feed. The bank agreed to lend this amount, but only if the Bradfords secured the loan with real estate. The Bradfords report that this was unusual, given that the bank had not previously secured its loans with real estate. *Id.* ¶ 42.

The Bradfords agreed to execute a deed of trust for the $220,000 loan, but when they showed up at the title company to sign the papers, they were surprised to discover that

> BEO was attempting to obtain additional security not just for the $220,000 loan, as BEO had represented to them. Instead, and contrary to BEO's representation, BEO prepared paperwork for additional security that was for <u>all</u> of the outstanding obligations by the Bradfords with BEO. BEO did not inform the Bradfords of this unexpected change. Furthermore, the additional security was not limited to their business related real estate, but included their personal residence. This was contrary to the express representations by BEO when the $220,000 loan was discussed and verbally authorized.

*Id.* ¶ 43.

The Bradfords initially refused to sign the deeds but said they eventually did so because of the imminent need to purchase feed and because they did not have sufficient time to explore other financing options. *Id.* ¶ 46. They also believed that because they had now signed over all their real estate to the bank, the bank would later renew the operating line of credit.

The Bradfords thus obtained additional funds for cattle feed during the fall, but the winter of 2016-17 was extremely severe, which resulted in a need for substantially more feed than in a normal year. In February 2017, the Bradfords asked the bank for an additional loan to purchase more feed.

The bank responded by asking Ryan Bradford to come meet with his loan officer to renew the line of credit. Mr. Bradford met with the BEO loan officer and other bank representatives on two occasions and both times, bank representatives assured him that BEO "was an agricultural bank and that they were in it for the long haul." ¶ 58.

In a third meeting, however, BEO loan officers told Mr. Bradford that the bank would not renew the operating line of credit unless Bradford put his cattle under contract. *Id.* ¶ 68. Mr. Bradford did as the bank requested, even though this was not his normal practice. In years past he had been able to get better prices by selling the cattle later. Regardless, he put cattle under contract because he needed to renew the line of credit.

When Mr. Ryan had the contracts in hand, he reported back to the bank, fully expecting that the line of credit would be renewed. But plaintiffs report that the bank reneged on its promise to renew the line of credit and also told Mr. Ryan to "'break all contracts and hedges' and 'sell the cattle.'" *Id.* ¶ 77. Mr. Bradford refused to do so; he

says if "he did as instructed by BEO, his reputation in the cattle industry would be destroyed." *Id.* ¶ 77.

By the spring of 2017, the Bradfords thus found themselves having entered into unfavorable sales contracts and starved of operating cash. To make matters worse, BEO allegedly caused third parties (one of whom was a bank client) to file agricultural service liens – "feed liens" – against Mr. Bradford. *See id.* ¶¶ 89, 92. The upshot, apparently, is that when Mr. Bradford later sold cattle, he was not able to access the cash generated by those sales. The Bradfords allege that BEO intentionally created these problems. As they put it,

> By causing feed liens to be filed, BEO knew the feed lien would cause further financial complications for the Bradfords and limit their ability to locate other credit options. Thereby hastening the demise of the Bradford's cattle operation. BEO could then shut-down the Bradford's cattle operation and foreclose on all of their real estate, including the Bradford's modest personal residence. BEO could liquidate all of the Bradfords assets.

*Id.* ¶ 93.

The Bradfords were unsuccessful in their efforts to obtain financing from other lenders. In September 2017, the bank initiated foreclosure proceedings and later sought to obtain possession of the Bradfords' crops, cattle, calves, accounts, inventory, and equipment. *See id.* ¶¶ 113, 116. The Bradfords say they were thus forced into bankruptcy in late November 2017. In August 2018, they filed this adversary proceeding and moved to withdraw the reference.

## ANALYSIS

Federal district courts have original jurisdiction over cases arising under the

Bankruptcy Code. 28 U.S.C. § 1334(a). This Court has exercised its authority under 28 U.S.C. § 157(a) to refer all bankruptcy matters to the district's bankruptcy judges. Nevertheless, under 28 U.S.C. § 157(d), this reference is subject to mandatory or permissive withdrawal, depending on the circumstances. *See* 28 U.S.C. § 157(d). Section 157(d) reads as follows:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

The Bradfords contend that both mandatory and permissive withdrawal apply.

**1.      Mandatory Withdrawal**

Beginning with mandatory withdrawal, plaintiffs contend that this Court must withdraw the reference because they allege state-law claims in their adversary complaint. But Congress has not mandated withdrawal of the reference in cases where the bankruptcy courts must consider *state* law to resolve an adversary proceeding. Rather, the statute says withdrawal is mandatory if the bankruptcy court would have to consider both title 11 and other *federal law* to resolve the proceeding. *See id.* (referring to "other laws *of the United States.*" *Id.* (emphasis added). The statute does not say anything about state law. The Court is thus unpersuaded by the Bradfords' mandatory withdrawal argument. This Court's standing referral order applies, and the bankruptcy court may therefore adjudicate the Bradfords' state-law claims on the basis of these claims' "relationship to the petition for reorganization." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458

U.S. 50, 72 n.26 (1982) (plurality opinion); *see also* 28 U.S.C. § 1334(b).

2.   **The Bankruptcy Court's Constitutional Authority**

The Bradfords' more serious argument is that the bankruptcy court lacks constitutional authority to enter judgment on their claims. The starting point of this argument is Article III, § 1 of the United States Constitution, which mandates that "[t]he judicial Power of the United States, shall be vested" in courts whose judges "shall hold their offices during good Behaviour" and "receive for their Services[] a Compensation [] [that] shall not be diminished during their tenure." This requirement is "an inseparable element of the constitutional system of checks and balances that both defines the power and protects the independence of the Judicial Branch." *Stern v. Marshall*, 564 U.S. 462, 482-83 (2011) (citing *N. Pipeline*, 458 U.S. at 54, internal quotation marks omitted).

Bankruptcy judges lack Article III's tenure and salary protections, and the adjudication of "private rights" – historically described as "the liability of one individual to another under the law as defined" – is part of the judicial power reserved to Article III courts. *Id.* at 490. Thus, bankruptcy courts cannot enter final judgments on claims involving liability between individuals unless the claims falls within the "public-rights" exception to Article III. *Id.* at 491. Public rights claims are those that "derive[] from a federal regulatory scheme, or in which resolution of the claim by an expert governmental agency is essential to a limited regulatory objective within the agency's authority." *Id.*

The Bradfords' claims arise only under state law and although they ultimately seek to augment the bankruptcy estate, these claims will not "necessarily be resolved in the claims allowance process." *Id.* at 499. In fact, the Bradfords have not even sought to

disallow BEO's claim. As a result, the bankruptcy court is constitutionally prohibited from entering final judgment.

But this does not mean that the Court must immediately withdraw the reference. Rather, the Court may delay withdrawing the reference until the bankruptcy court certifies that the case is trial-ready. *Accord Beck v. Ally Fin., Inc.*, Case No. 13-mc-16, 2013 WL 5676232, at *1 (S.D. Ala. Oct. 18, 2013) (district court granted motion for withdrawal after determining mandatory withdrawal applied, but nevertheless "delay[ed] the withdrawal until the Bankruptcy Court certifies that the case is ready for trial").

## 2. Waiver

BEO argues that the Bradfords waived their right to have an Article III court determine their claims. The adversary complaint alleges that this is a core proceeding and further states that the Bradfords "expressly consent[] to this Court's entry of final decisions and orders in this matter." *Compl.*, Bankr. Dkt. 1, ¶ 6. On the same date, however, the Bradfords filed a motion to withdraw, stating that they did not consent to having the bankruptcy court finally determine their claims.

A party may consent to having *Stern* claims adjudicated in bankruptcy court (either expressly or impliedly), but any such consent must be "knowing and voluntary." *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015).

Here, the Bradfords' behavior is ambiguous: on the one hand, they expressly consent to the bankruptcy court's entry of final orders, yet on the other, they insist on an Article III court. Under these unique circumstances, and given that a waiver must be knowing and voluntary, the Court concludes that the Bradfords have not waived their

right to an Article III court. As a result, if the claims stated in the complaint proceed to trial, an Article III judge will preside. *See* 28 U.S.C. § 157(e);[2] *In re Dyer*, 322 F.3d 1178, 1194 (9th Cir. 2003) ("[T]he bankruptcy court is unable to preside over a jury trial absent explicit consent from the parties and the district court."); *In re Cinematronics, Inc.*, 916 F.2d 1444, 1451 (9th Cir. 1990) (agreeing with "several courts [that] have concluded that where a jury trial is required and the parties refuse to consent to bankruptcy jurisdiction, withdrawal of the case to the district court is appropriate") (internal citations omitted)).

3. **Need for Immediate Withdrawal**

The next question is whether the Court should withdraw the proceeding now, rather than waiting until the bankruptcy court certifies that the claims are ready for trial. As noted above, despite the Bradfords' right to a jury trial presided over by an Article III judge, the Court is not required to immediately withdraw the reference. Rather, it is permissible for the bankruptcy court to handle all preliminary matters up to the point of trial. *See Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d 775, 787 (9th Cir. 2007) ("a Seventh Amendment jury trial right does not mean the bankruptcy court must instantly give up jurisdiction" and transfer the case to district court). *Cf. Executive Benefits Ins. Agency v. Arkison,* 134 S. Ct. 2165, 2174 (2014); 11

---

[2] In full, 28 U.S.C. § 157(e) provides:

> If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.

U.S.C. § 157(c)(1).

Thus, in this case, the bankruptcy court may "hear" the claims and submit proposed findings of fact and conclusions of law to the district court. *Id.* Further, if either party files a dispositive motion, the bankruptcy court may entertain that motion and submit proposed findings of fact, conclusions of law, and a recommended disposition of the claim to this Court. *See Bellingham Ins. Agency*, 702 F.3d at 565 (bankruptcy courts have the statutory power "to hear fraudulent conveyance cases and to submit reports and recommendations to district courts").

4.  **Permissive Withdrawal**

Given that this case *may* properly remain in bankruptcy court for pretrial proceedings, the next question is whether it *should* remain there. At this point in the proceedings, the Court's central concern is how it can best help the parties achieve a just, speedy, and inexpensive resolution of their claims. *Cf.* Fed. R. Civ. P. 1. Many of the "cause" factors relevant to permissive withdrawal – including efficiency, cost, and delay – speak to this concern.

Withdrawal is permissive in any case or proceeding referred to a bankruptcy court upon the district court's own motion, or on a party's timely motion for "cause shown." 28 U.S.C. § 157(d). The statute does not specify what is necessary to show "cause," but courts have identified a variety of factors that may be considered, including: (1) the efficient use of judicial resources; (2) delay and costs to the parties; (3) uniformity of bankruptcy administration, (4) prevention of forum shopping; and (5) other related factors. *Sec. Farms v. Int'l Brotherhood of Teamsters,* 124 F.3d 999, 1008 (9th Cir.

1997). "Other related factors" might include whether the issues are core or non-core proceedings, as well as the right to a jury trial. *See Rosenberg v. Harvey A. Brookstein*, 479 B.R. 584, 587 (D. Nev. 2012) (citation omitted).

After having considered these factors, the Court is convinced that the best path forward is for this proceeding to remain in bankruptcy court for all pretrial proceedings.

This case is in its beginning stages, so, in theory, the case would move along at the same speed in either district court or bankruptcy court. But that is not true here for at least two reasons. First, the bankruptcy court has expended significant time and effort over the past year becoming familiar with the underlying bankruptcy proceeding. That knowledge will encompass the relationship between the Bradfords and the bank, which is a key part of the entire adversary proceeding, and will likely allow the case to proceed more efficiently and more quickly. Second, as of January 1, 2019, the District of Idaho has just two Article III judges accepting civil filings.[3] The unfortunate, inevitable result of this shortage of Article III judges means that this civil lawsuit will proceed far more slowly in district court than in bankruptcy court.

Further, although conducting pretrial proceedings in one court, and then moving to another for trial, could potentially cause inefficiencies, there is a very real possibility that this case – like most – will resolve before trial.

Granted, if the case does proceed to trial, there will be judicial efficiency losses because a second court will have to familiarize itself with the case. Further, this Court

---

[3] As of January 1, 2019, Senior Judge Edward J. Lodge no longer accepts civil filings.

may be required to conduct a de novo review of proposed findings and conclusions on dispositive motions. Such a procedure could increase costs to the parties and cause some delay. But these possible inefficiencies, delays, and costs do not overcome the weight this Court has placed on the familiarity the bankruptcy court has with the debtor, the bankruptcy estate, and the debtor's relationship and dealings with BEO. The Court will therefore delay withdrawing the reference on this adversary proceeding until the bankruptcy court certifies that such claims are ready for trial.

## ORDER

**IT IS ORDERED that** Plaintiffs' Motion to Withdraw the Reference (Dkt. 1) is **GRANTED IN PART** and **DENIED IN PART** and Plaintiff's Motion to Transfer Venue (Dkt. 4) is **REFERRED** to the bankruptcy court as follows:

1) The Motion to Withdraw the Reference is **GRANTED** to the extent plaintiffs seeks a withdrawal when the bankruptcy court certifies that this case is ready for trial.

2) The Motion to Withdraw the Reference is **DENIED** to the extent plaintiffs seeks an immediate withdrawal.

3) The bankruptcy court will preside over all pretrial matters in this case, including discovery and pretrial conferences, and will resolve routine and dispositive motions, including the pending Motion To Transfer Venue (Dkt. 4). If either party files a dispositive motion, the bankruptcy court will entertain that motion and submit proposed findings of fact, conclusions of law, and a recommendation for disposition to this Court.

4) If and when it becomes clear that a jury trial will be necessary, and the case is prepared and ready for trial to begin, the bankruptcy court shall so certify to this Court and the reference will be withdrawn at that time.

5) Until the bankruptcy court certifies that this case is ready for trial, the parties shall file all motions, pleadings, and other papers in the adversary proceeding in bankruptcy court.

DATED: January 3, 2019

B. Lynn Winmill
U.S. District Court Judge